Filed 4/18/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| NATALIA HERNANDEZ, | B238408 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC402779) |
| v. | |
| AMCORD, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mary Ann Murphy, Judge.  Reversed.

Baron & Budd, John Langdoc and Denyse F. Clancy for Plaintiff and Appellant.

Selman Breitman, Jerry C. Popovich, Craig R. Maki, and N. Asir Fiola for Defendant and Respondent.

Natalia Hernandez (appellant), individually and as successor in interest to Arnulfo Hernandez, deceased (Mr. Hernandez or decedent), appeals from a judgment of nonsuit in favor of respondent Amcord, Inc. (respondent).[1] Appellant and Mr. Hernandez brought suit against respondent and other defendants for negligence and strict liability after Mr. Hernandez was diagnosed with mesothelioma in 2008, at the age of 62. At the start of trial, respondent was the only remaining defendant in the case.[2] Nonsuit was granted in favor of respondent after the appellant's presentation of evidence, on the ground that appellant failed to present evidence that respondent's product, Riverside's asbestos-containing gun plastic cement, was a substantial factor in causing Mr. Hernandez's mesothelioma to a reasonable degree of medical probability. The trial court cited *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953 (*Rutherford*), and *Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078 (*Whitmire*), in support of its decision.

We find that the evidence presented by appellant at trial, evaluated in a light most favorable to appellant, meets the standard set forth in *Rutherford* and its progeny. Therefore we reverse the judgment of nonsuit. We further find that the trial court erred in excluding evidence of respondent's lobbying activities under the *Noerr-Pennington* doctrine. The evidentiary ruling was based on a misapplication of law and therefore constituted an abuse of discretion. The evidentiary ruling is also reversed.

## CONTENTIONS

Appellant contends that the trial court erred in granting nonsuit because appellant presented sufficient evidence to meet the *Rutherford* standard for proving causation in asbestos cases.

Appellant further contends that the trial court erred in excluding evidence of respondent's lobbying activities under the *Noerr-Pennington* doctrine.

---

[1]     Amcord was sued individually and as successor in interest to Riverside Cement.

[2]     Mr. Hernandez was deceased at the time of trial.

2

# FACTUAL BACKGROUND

Mr. Hernandez was diagnosed with malignant mesothelioma in 2008, when he was 62 years old. He died one year later. He left behind his wife of 37 years, three daughters and two sons.

Mesothelioma is a fatal cancer that develops in the lining of the lungs. It occurs when asbestos fibers get into the pleural area and cause irritation. As the cancer spreads, it grows thicker and ultimately pushes in the lung, causing it to collapse, which in turn ruins the capacity of the lung to exchange carbon dioxide with oxygen. The victim ultimately suffocates from the tumor. The latency period between exposure to asbestos and mesothelioma is usually 30 to 35 years or longer.

Mr. Hernandez was exposed to asbestos while working as a carpenter and construction worker in southern California during the 1960's through 1980's. Alfredo Hernandez (Alfredo), Mr. Hernandez's younger brother, worked with Mr. Hernandez for about 10 to 12 years beginning in 1969. They did not constantly work together; they worked apart during the week but worked together on the weekends to earn extra money. During this time period, the brothers worked together on about 20 houses and a few apartment buildings. They never built houses from the ground up, only additions on existing homes. They also worked together on commercial construction sites.

The majority of the brothers' work during this time was interior, as opposed to exterior work. However, they did perform some work on the outside of houses. Alfredo described the work as "stucco[ing] the houses." Riverside gun plastic cement was one of the stucco products the brothers used on the exterior of homes during the time period from 1969 through the 1970's. While there were other products available, Riverside gun plastic cement held better and was easier to apply. Although it cost a few dollars more, Alfredo and the decedent would buy Riverside gun plastic cement because it would make the job "faster and easier" and they could move on to a different job more quickly. They applied Riverside gun plastic cement "all the time" or about 75 percent of the time.

Riverside gun plastic cement was packaged in 94-pound bags. In order to open a bag of Riverside gun plastic cement, Mr. Hernandez would cut the bag in the middle,

3

which created visible dust around his face and clothing. Mr. Hernandez would then dump the bag of Riverside gun plastic cement into a mixer, which also created "a little bit" of dust that got on his face and clothing. Mr. Hernandez did not apply the Riverside gun plastic cement with a gun, because it was too expensive. Alfredo was not able to come up with an approximate number of times that Mr. Hernandez used Riverside gun plastic cement, however, when asked how often the brothers worked with Riverside gun plastic cement, Alfredo replied: "A lot of times."

Riverside gun plastic cement was manufactured from 1959 to 1979. It contained a small amount of asbestos. There was no warning on the Riverside gun plastic cement that it could cause cancer. Riverside gun plastic cement was the only product manufactured by respondent which contained asbestos. Respondent was in full compliance with the regulations and requirements with respect to asbestos-containing products.

## PROCEDURAL HISTORY

### The pleadings

Appellant and Mr. Hernandez brought suit against respondent and 11 other defendants on November 26, 2008, alleging negligence, strict liability, and related claims. Respondent filed an answer on January 26, 2009.

Mr. Hernandez died on April 18, 2009. In October 2009, appellant filed a second amended complaint for wrongful death and survival, naming respondent and several other defendants. After the trial court granted an omnibus motion to strike in favor of respondent and other defendants, appellant filed a third amended complaint on April 15, 2010. The third amended complaint alleged causes of action for negligence and strict liability against respondent and others.

### Trial

Trial commenced on November 14, 2011, with respondent the only remaining defendant.

4

*Testimony of Richard Lemen, Ph.D.*

At trial, appellant presented Richard Lemen, Ph.D., an epidemiologist, former Assistant Surgeon General of the United States, and former deputy director of the National Institute of Occupational Safety and Health (NIOSH). Dr. Lemen described epidemiology as "a field of medicine that is the study of disease patterns and populations." He explained that an epidemiologist studies what causes diseases, and then uses that information to implement disease prevention. Dr. Lemen explained that his testimony would concern "the health effects and our knowledge of those health effects as they relate to risks from exposure to asbestos."

Dr. Lemen studied asbestos since 1970. As part of his research, he wrote a position paper which was adopted as the official position of the World Health Organization. The paper took the position that asbestos caused lung cancer, mesothelioma, and several other types of cancers, and that all forms of asbestos were carcinogenic. He also wrote the NIOSH criteria document with respect to asbestos, which concluded that there was no safe level that could be identified for exposure to asbestos that would eliminate the risk of developing cancer. Dr. Lemen testified that mesothelioma is a cancer specifically associated with asbestos exposure, and that the major cause of mesothelioma is exposure to asbestos.

Dr. Lemen opined that if a worker poured a 94-pound bag of Riverside gun plastic cement containing asbestos, the worker would be at increased risk for developing mesothelioma as long as the asbestos fibers were respirable and airborne. Dr. Lemen also opined that if a worker were exposed to many different asbestos-containing products, each of those products would contribute to an increased risk of asbestos-related disease, as long as the asbestos was inhaled and retained in the worker's body.

Dr. Lemen is not a medical doctor. He did not diagnose Mr. Hernandez, and was not his treating physician. He could not testify as to the specific cause of Mr. Hernandez's mesothelioma. Dr. Lemen did not review any case-specific information or any of Mr. Hernandez's medical records, and he was not asked to give any specific opinions about Mr. Hernandez.

5

### *Testimony of Richard Kradin, M.D.*

Dr. Richard Kradin is a medical doctor, the Director of Pulmonary Immunology and Molecular Biology and a pulmonary pathologist at Massachusetts General Hospital, as well as a professor at Harvard Medical School. He is board certified in anatomic pathology, pulmonary medicine, and internal medicine.

Dr. Kradin reviewed the medical records, work history, and histological materials of Mr. Hernandez.[3] Pursuant to a stipulation between the parties, Dr. Kradin did not appear live. Instead, his report was read into evidence.

Dr. Kradin confirmed that Mr. Hernandez had malignant mesothelioma of the pleura. As to Mr. Hernandez's exposure, Dr. Kradin stated:

> "Mr. Hernandez was repeatedly exposed to asbestos while working as a carpenter, construction worker, and production worker from 1963 through the 1990's at various sites. He worked directly with asbestos-containing materials and in proximity to other tradesmen who cut, sawed, mixed, applied, sanded, and swept-up asbestos containing materials."

Dr. Kradin stated: "It is my opinion, to a reasonable degree of medical probability, that his malignant mesothelioma was caused by asbestos."

### *Appellant's proposed evidence of respondent's government lobbying activity*

At trial, appellant advised the court that she intended to introduce evidence of respondent's government lobbying activities. Specifically, appellant intended to present evidence that respondent successfully lobbied for an exemption to a 1975 amendment to the California Health and Safety Code banning asbestos spray construction products. Appellant argues that this evidence of respondent's lobbying activity was relevant and admissible to show negligence, in that respondent took steps to continue selling its Riverside gun plastic cement despite knowledge that the product was harmful.

The trial court granted respondent's motion to exclude this evidence of its lobbying and petitioning activities, and ordered that "[n]o evidence of lobbying activity

---

[3]     "Histological materials" refers to Mr. Hernandez's lung tissue.

or any other advocacy before the state Legislature will be allowed." The court's ruling was based on the *Noerr-Pennington* doctrine.

**The trial court's grant of nonsuit**

Appellant concluded her presentation of evidence on November 21, 2011. After the conclusion of appellant's evidence, respondent immediately made an oral motion for nonsuit pursuant to Code of Civil Procedure section 581c, *Rutherford*, and related authorities.

Respondent argued that appellant failed to establish the required element of specific causation. Respondent's position was that Dr. Lemen did not offer specific causation testimony, and that Dr. Kradin did not state to a reasonable degree of medical probability that respondent's product was a substantial factor in causing the decedent's illness.

The trial court granted respondent's motion for nonsuit. The court found that appellant failed to show that respondent's product caused Mr. Hernandez's mesothelioma to a reasonable degree of medical probability, as required by *Rutherford* and related authorities. The court explained its belief that the relevant authorities required that "a doctor of some kind, somebody with an M.D. after his name, has got to say with a reasonable degree of medical probability that [respondent's] product was a substantial factor in causing his injuries."

The trial court questioned whether Dr. Lemen's degree of Ph.D., rather than M.D., rendered him unqualified to provide the causation testimony required by *Rutherford*: "Reasonable degree of medical probability, you think someone with a Ph.D. in epidemiology can say that?" The court also expressed concern that Dr. Lemen used the words "reasonable scientific certainty" and did not "utter the words 'reasonable degree of medical probability.'" The court felt that "[t]he experts, just like in medical malpractice, say that there's causation, that it is my opinion that X caused Y with a reasonable degree of medical probability. That's the normal, customary way they say it, and nobody said that here."

7

The trial court made reference to CACI No. 435, which states: "[Plaintiffs] may prove that exposure to asbestos from [defendant's product] was a substantial factor causing [decedent's] illness by showing, through expert testimony, that there is a reasonable medical probability that the exposure was a substantial factor contributing to [decedent's] risk of developing cancer."

The trial court also relied on the following quote from *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 701 (*Whiteley*):

> "Increased risk alone is not actionable. In toxic tort cases generally, 'plaintiffs must establish, to *a reasonable medical probability, their illnesses* were caused by the toxic exposure. The fact that chemicals increased the possibility of sickness in the overall population does not suffice to provide a causal link with plaintiff's illnesses.' [Citation.]"

Finally, referring to *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1384 (*Cottle*), the court stated, "'[m]ere possibility alone is insufficient to establish a prima facie case. That there is a distinction between a reasonable medical "probability" and a medical "possibility" needs little discussion.'"

The court evaluated the testimony of each of appellant's experts. The court pointed out that appellant's epidemiologist, Dr. Lemen, did not specifically testify that decedent's exposure to respondent's product was a cause of the decedent's illness. The court stated: "I think you need reasonable degree of medical probability, and the epidemiologist doesn't do it." The court also noted that appellant's medical doctor, Dr. Kradin, "didn't testify that this defendant's product caused the mesothelioma by a reasonable degree of medical probability." Because *Rutherford* appeared to require such testimony, the trial court granted the motion for nonsuit.

## DISCUSSION

### I. Nonsuit

#### A. *Standard of review*

"A nonsuit in a jury case or a directed verdict may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which

8

it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor. [Citations.]" (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583.) Nonsuit is appropriate where the plaintiff's proof raises nothing more than speculation, suspicion or conjecture. (*Helm v. K.O.G. Alarm Co.* (1992) 4 Cal.App.4th 194, 198, fn. 1.)

In reviewing a grant of nonsuit, the appellate court evaluates the evidence in the light most favorable to the plaintiff. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.) The judgment of nonsuit will be affirmed if a judgment for the defendant is required as a matter of law, after resolving all presumptions, inferences and doubts in favor of the plaintiff. (*Ibid.*) The review of a grant of nonsuit is de novo. (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541-1542.)

### B. The standard for proving causation in asbestos cases

In order to determine whether appellant set forth sufficient evidence of causation, we must first discuss the applicable standards set forth in the relevant case law.

*Rutherford* involved an individual who sued an asbestos manufacturer (Owens-Illinois) and 18 other defendants alleging that he had contracted lung cancer as a result of his exposure to asbestos products while on the job. After he died, the complaint was amended to allege wrongful death. (*Rutherford, supra*, 16 Cal.4th at pp. 958-959.) At trial, plaintiffs presented medical evidence that Rutherford had died of asbestos-related lung cancer, and that he had been exposed to respirable asbestos dust on a daily basis during periods of his employment on a Naval shipyard. (*Id.* at p. 960.) After the liability phase of trial, nearly all the defendants except Owens-Illinois settled with the plaintiffs. (*Ibid.*)

In the next phase of trial, the court instructed the jury that if the plaintiff has proved that a particular asbestos supplier's product was "defective," that the plaintiff's injuries or death were legally caused by asbestos exposure generally, and that he was exposed to the defendant's product, the burden shifted to the defendant to prove that its

9

product was *not* a legal cause of the plaintiff's injuries or death. (*Rutherford, supra*, 16 Cal.4th at p. 961.)

The Supreme Court determined that the burden-shifting instruction was erroneous, and that a burden-shifting instruction was unnecessary in asbestos cancer cases. (*Rutherford, supra*, 16 Cal.4th at p. 978.) Instead, the high court held:

> "In the context of a cause of action for asbestos-related latent injuries, the plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products, *and* must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury. In an asbestos-related cancer case, the plaintiff need *not* prove that fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth. Instead, the plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's *risk* of developing cancer. The jury should be so instructed."

(*Rutherford, supra*, 16 Cal.4th at p. 982-983, fns. omitted.)[4]

However, the *Rutherford* court held that the instructional error was harmless in that case. The plaintiffs had presented the testimony of Dr. Allan Smith, a professor of epidemiology. Dr. Smith testified that asbestos-related lung cancers are dose-related diseases, and that all occupational exposures through the latency period can contribute to the risk of contracting the diseases. (*Rutherford, supra*, 16 Cal.4th at p. 961). Owens-Illinois presented a competing expert, who testified that a very light or brief exposure could be considered "'insignificant or at least nearly so'" in the "'context'" of other, very heavy exposures. (*Ibid.*) There was no evidence that Rutherford had been exposed predominantly to any one kind or brand of asbestos product. (*Ibid.*)

---

[4]    Notably, the *Rutherford* court made no distinction between general causation and specific causation. Therefore, despite respondent's use of these terms, we decline to evaluate the evidence in terms of general versus specific causation, and instead evaluate appellant's evidence as a whole.

In addition, both parties presented evidence relevant to the determination of the proportion of asbestos-containing insulation used at the defendant's workplace during plaintiff's period of employment that was supplied by the defendant. (*Rutherford, supra*, 16 Cal.4th at p. 984.) Both parties also presented expert medical testimony on the relationship between asbestos exposure and lung cancer. (*Ibid.*)

After reviewing the evidence and arguments of counsel, the Supreme Court concluded that the erroneous instruction in no way impaired the defendant's ability to present its full case on substantial factor causation to the jury. (*Rutherford, supra*, 16 Cal.4th at p. 983.)

The *Rutherford* court made reference to *Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409 (*Lineaweaver*). In *Lineaweaver*, three individuals brought claims against numerous asbestos suppliers seeking recovery for injuries arising from their repeated exposure to asbestos products. The trial court granted the respondent's nonsuit motion on the issue of liability, concluding that appellants failed to present sufficient evidence of their exposure to the respondent's product. The *Lineaweaver* court reversed the judgment of nonsuit as to appellant Lineaweaver only, concluding that there was sufficient circumstantial evidence to support a reasonable inference of exposure. (*Id.* at pp. 1412-1413.)

The *Lineaweaver* court discussed a plaintiff's burden in asbestos litigation. First, "a plaintiff must demonstrate exposure to a defendant's product and biological processes from the exposure which result in disease." (*Lineaweaver, supra*, 31 Cal.App.4th at pp. 1415-1416.) In evaluating whether an exposure was a substantial factor in causing asbestos disease, the *Lineaweaver* court concluded that the standard should be: "is there a reasonable medical probability based upon competent expert testimony that the defendant's conduct contributed to plaintiff's injury. [Citations.]" (*Id.* at p. 1416, fn. omitted.) The *Lineaweaver* court explained:

> "Many factors are relevant in assessing the medical probability that an exposure contributed to plaintiff's asbestos disease. Frequency of exposure, regularity of exposure, and proximity of the asbestos product to plaintiff are certainly relevant, although these considerations should not be

11

determinative in every case. [Citation.] Additional factors may also be significant in individual cases, such as the type of asbestos product to which plaintiff was exposed, the type of injury suffered by plaintiff, and other possible sources of plaintiff's injury. [Citations.] 'Ultimately, the sufficiency of the evidence of causation will depend on the unique circumstances of each case.' [Citation.]"

(*Lineaweaver, supra*, 31 Cal.App.4th at p. 1416-1417.)

The *Lineaweaver* court concluded that this substantial factor test did not place too great a burden on an asbestos plaintiff. "Plaintiffs are free to demonstrate that a particular asbestos disease is cumulative in nature, with many separate exposures contributing to their injuries. Prima facie evidence of causation may consist of proof that exposure to a particular defendant's asbestos product aggravated the character or extent of the plaintiff's disease. [Citation.]" (*Lineaweaver, supra*, 31 Cal.App.4th at p. 1417.)

The *Lineaweaver* court held that appellant Lineaweaver's evidence of causation was adequate to survive a motion for nonsuit. He presented sufficient evidence of exposure at his workplace. In addition, a physician expert in occupational medicine (Dr. Cohen) concluded that Lineaweaver's exposure to the defendant's product was "'a very substantial factor'" in causing Lineaweaver's asbestosis. In fact, the physician went so far as to opine that it was "more likely than not that Lineaweaver would have developed asbestosis-related disease from the exposure to [respondent's] products alone." (*Lineaweaver, supra*, 31 Cal.App.4th at p. 1420.)

Significantly, however, the *Lineaweaver* court felt that even *without* this physician's analysis, Lineaweaver presented sufficient evidence to support a finding that the respondent's product was a substantial factor in contributing to his asbestosis. Noting that the defendant objected to the methodology used by Lineaweaver's physician expert, the court stated:

> "[Defendant] disputes the validity of these opinions as based on unsupported quantification in 'fiber-years' of [plaintiff's] exposure to Pabco. But the opinions of plaintiffs' experts and an inference of Pabco exposure as a substantial factor in contributing to [his] asbestosis may be

12

drawn from evidence independent of Dr. Cohen's quantification methodology. As discussed above, [plaintiff] presented evidence of exposure to [defendant]-supplied Pabco on a regular basis over more than 30 years of working with and near asbestos insulation products. [Plaintiff] was exposed to pipe covering and block insulation which is friable and 'very powdery,' and created visible dust reminiscent of a 'snow storm.' While there are other possible sources of [plaintiff's] asbestosis given his exposure to many different asbestos products, it is significant that Pabco products were prominent and prevalent at his work site. Viewing this evidence in [plaintiff's] favor, it was sufficient to support a jury's inference that exposure to Pabco products was a substantial factor in causing [plaintiff's] asbestosis."

(*Lineaweaver, supra*, 31 Cal.App.4th at p. 1420.)

More recently, the Court of Appeal considered the issue of causation in asbestos litigation in *Whitmire*. In *Whitmire*, the widow of an electrician who died of mesothelioma brought suit against Bechtel, among others, alleging that the decedent contracted mesothelioma from exposure to asbestos-containing products produced by the defendants at various power plants where he worked. Bechtel brought a motion for summary judgment on the issue of causation, arguing that the plaintiff had not produced, and could not produce, evidence that he was ever exposed to asbestos attributable to Bechtel, much less that Bechtel-attributable asbestos was a substantial factor in causing the plaintiff's injury. (*Whitmire, supra*, 184 Cal.App.4th at pp. 1082-1083.) The motion was granted, and affirmed on appeal. The *Whitmire* court applied the standard set forth in *Rutherford*, explaining that the plaintiff bore the burden of "'demonstrating that exposure to [Bechtel's] asbestos products was, in reasonable medical probability, a substantial factor in causing or contributing to [Whitmire's] risk of developing cancer.' [Citation.]" (*Whitmire*, at p. 1084.) The *Whitmire* court further explained the plaintiff's obligation as follows:

"'[Plaintiffs] cannot prevail against [Bechtel] without evidence that [Whitmire] was exposed to asbestos-containing materials manufactured or furnished by [Bechtel] with enough frequency and regularity as to show a

reasonable medical probability that this exposure was a factor in causing the plaintiff's injuries.' [Citations.]"

(*Whitmire, supra*, 184 Cal.App.4th at p. 1084.)

The *Whitmire* court made no reference to the type of expert testimony required, nor did it suggest that *Rutherford* requires "a person with an M.D. after their name" to expressly state that the defendant's product caused the plaintiff's injury to a reasonable degree of medical probability.

### C. Application of the **Rutherford** *standard to the evidence in this case*

Based on the authorities discussed above, we apply the following standard in determining whether appellant set forth sufficient evidence of causation in this matter: (1) first, appellant must establish some threshold *exposure* to Riverside gun plastic cement; and (2) appellant must further establish in reasonable medical probability that the exposure to Riverside gun plastic cement was a "legal cause" of Mr. Hernandez's injury, i.e., a *substantial factor* in bringing about the injury. Appellant may meet the burden of proving that exposure to Riverside gun plastic cement was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to Mr. Hernandez's *risk* of developing cancer. (*Rutherford, supra*, 16 Cal.4th at pp. 982-983.) Further, we bear in mind the Supreme Court's instruction that "[t]he substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." (*Id.* at p. 978.)

We find that appellant met this standard. As to the first requirement that appellant show a threshold exposure to Riverside gun plastic cement, Mr. Hernandez's brother's testimony was sufficient. As set forth above, Alfredo worked with decedent for 10 to 12 years, starting in 1969. They did not constantly work together; they worked apart during the week but worked together on the weekends to earn extra money. During this time period, Mr. Hernandez used Riverside gun plastic cement "a lot of times," or "all the time."

14

Riverside gun plastic cement was packaged in 94-pound bags. In order to open a bag of Riverside gun plastic cement, Mr. Hernandez would cut the bag in the middle, which created visible dust around his face and clothing. Mr. Hernandez would then dump the bag of Riverside gun plastic cement into a mixer, which also created "a little bit" more dust that got on his face and clothing.

This testimony meets the threshold requirement of exposure to the respondent's product.[5]

Further, appellant presented sufficient evidence that respondent's product was a substantial factor in bringing about Mr. Hernandez's illness. First, as in *Rutherford*, appellant presented an epidemiologist who testified generally that if a worker were exposed to many different asbestos-containing products, each of those products would contribute to an increased risk of asbestos-related disease, as long as the asbestos was inhaled and retained in the worker's body. (See *Rutherford, supra*, 16 Cal.4th at p. 961 ["Dr. Allan Smith, a professor of epidemiology, testified that asbestos-related lung cancers are dose-related diseases, and that all occupational exposures through the latency period can contribute to the risk of contracting the diseases"].) Appellant's epidemiologist also testified, hypothetically, that if a worker poured a 94-pound bag of Riverside gun plastic cement, the worker would be at increased risk for developing mesothelioma as long as the asbestos fibers were respirable and airborne.

Dr. Kradin's testimony was also a source of evidence regarding causation. Dr. Kradin reviewed the medical records, work history, and histological materials of the decedent and confirmed that Mr. Hernandez had malignant mesothelioma of the pleura. Dr. Kradin also confirmed that the decedent "'worked directly with asbestos-containing

---

[5] For the first time on appeal, respondent argues that there was insufficient evidence that the decedent was exposed to its product with sufficient frequency, regularity, and proximity to constitute a substantial factor in bringing about Mr. Hernandez's injury. Because this ground was not presented in respondent's motion for nonsuit, it is forfeited for the purposes of this appeal. (*Lawless v. Calaway* (1944) 24 Cal.2d 81, 92 ["on appeal from an order granting a nonsuit, the court will only consider the grounds specified in the motion at the trial"].)

materials and in proximity to other tradesmen who cut, sawed, mixed, applied, sanded, and swept up asbestos-containing materials.'"  Dr. Kradin gave his professional opinion that there was a direct connection between Mr. Hernandez's work history and his illness: "'It is my opinion, to a reasonable degree of medical probability, that [the decendent's] malignant mesothelioma was caused by asbestos.'"

Considering the testimony of Alfredo, Dr. Lemen, and Dr. Kradin, appellant met her burden of showing that, within reasonable medical probability, Riverside gun plastic cement was a substantial factor contributing to Mr. Hernandez's risk of developing cancer.  (*Rutherford, supra*, 16 Cal.4th at pp. 982-983.)

The trial court's rationale for granting respondent's motion for nonsuit was that appellant failed to show that respondent's product caused Mr. Hernandez's mesothelioma to a reasonable degree of medical probability.  The court explained its belief that the relevant authorities required that "a doctor of some kind, somebody with an M.D. after his name, has got to say with a reasonable degree of medical probability that [respondent's] product was a substantial factor in causing his injuries."

We disagree with the trial court's view that *Rutherford* mandates that a medical doctor must expressly link together the evidence of substantial factor causation.  The *Rutherford* court did not create a requirement that specific words must be recited by appellant's expert.  (See also *Tortorella v. Castro* (2006) 140 Cal.App.4th 1, 12 ["'*No recitation of "specific words or phrases* mirroring statutory language" *is necessary to establish causation*'"].)  Nor did the *Rutherford* court specify that the testifying expert in asbestos cases must always be "somebody with an M.D. after his name."  The *Rutherford* court agreed with the *Lineaweaver* court that "the reference to 'medical probability' in the standard 'is no more than a recognition that asbestos injury cases (like medical malpractice cases) involve the use of medical evidence.' [Citation.]" (*Rutherford, supra*, 16 Cal.4th at p. 976, fn. 11, citing *Lineaweaver, supra*, 31 Cal.App.4th at p. 1416, fn. 2.) The Supreme Court has since clarified that medical evidence does not necessarily have to be provided by a medical doctor.  (See *People v. Catlin* (2001) 26 Cal.4th 81, 131-132 ["[q]ualifications other than a license to practice medicine may serve to qualify a witness

16

to give a medical opinion"].)  To the extent that it concluded that Dr. Lemen's testimony did not qualify as medical evidence, the trial court erred.

Furthermore, the evidence set forth at trial in *Rutherford* appears nearly identical to the evidence that the appellant presented in the trial court below.  In *Rutherford*, the causation evidence included factual evidence of the decedent's exposure to respondent's product, expert testimony from an epidemiologist who opined as to the cause of mesothelioma generally, and expert medical testimony on the relationship between asbestos exposure and lung cancer.  Pursuant to *Rutherford*, such evidence is sufficient for a jury to determine the issue of causation.  (*Rutherford, supra*, 16 Cal.4th at p. 984 ["Both parties introduced evidence relevant to determining the proportion of asbestos-containing insulation used at Mare Island, during the period of decedent's employment there, that was supplied by defendant.  Both parties also presented expert medical testimony on the relationship between asbestos exposure and lung cancer. . . .  Plaintiff's expert presented [the] opinion[] to the effect that each exposure, even a relatively small one, contributed to the occupational 'dose' and hence to the risk of cancer"].)

Here, as in *Rutherford*, the appellant set forth evidence of the decedent's exposure to respondent's product, along with testimony regarding the dust which would become airborne and settle on Mr. Hernandez's face and clothing.  In addition, appellant presented expert testimony from an epidemiologist suggesting that if an individual is exposed to many different asbestos-containing products, each of those products would contribute to an increased risk of asbestos-related disease, as long as the asbestos was inhaled and retained in the worker's body.  And finally, appellant presented expert testimony that Mr. Hernandez's illness was caused by asbestos to a reasonable degree of medical probability.

Viewing this evidence in appellant's favor -- as we must -- it was sufficient to support a jury's inference that exposure to respondent's product was a substantial factor contributing to the decedent's risk of developing mesothelioma.  (*Lineaweaver, supra*, 31

17

Cal.App.4th at p. 1420; *Nally v. Grace Community Church, supra*, 47 Cal.3d at p. 291.) The judgment of nonsuit was improper.[6]

## II. Exclusion of evidence of lobbying activity

At trial, appellant advised the court that she intended to introduce evidence of respondent's government lobbying activities. The evidence appellant sought to introduce dealt with respondent's lobbying of California elected officials with respect to the continued use of asbestos in certain construction products. In 1975, California amended

---

[6]     The trial court cited two additional cases in support of its judgment of nonsuit, *Whiteley* and *Cottle*. We find these cases inapplicable to the analysis.

*Whiteley* involved claims filed by a smoker who developed lung cancer against tobacco companies. The tobacco company argued that Whiteley's design defect cause of action was not sustainable on appeal because Whiteley failed to prove that any negligent design feature was a cause of her illness. (*Whiteley, supra*, 117 Cal.App.4th at p. 694.) The defendants argued that the *Rutherford* standard for causation was inapplicable as it was specifically formulated for asbestos cases. The *Whiteley* court ultimately determined that it "need not determine whether the *Rutherford* variant on proof of causation applies here," because it was clear that the evidence was insufficient to support the jury's finding even under that standard. (*Whiteley, supra*, at p. 701.) However, because it was a design defect case, the *Whiteley* court reformulated the *Rutherford* standard to state: "The question here is whether plaintiff has shown 'in reasonable medical probability' that the alleged *negligent design* of those cigarette products was a substantial factor contributing to the dose of carcinogens Whiteley inhaled or ingested, and hence to her risk of developing lung cancer." (*Whiteley*, at p. 701.) The court concluded that Whiteley's evidence on this point was insufficient. (*Ibid.*)

*Cottle* was a complex toxic tort case involving tenants, former tenants and non-resident property owners of a residential subdivision that was built on a site that had been previously used as a dumping ground for hazardous waste and other by-products. The plaintiffs alleged that their injuries were caused by the defendants' failure to disclose the prior use of the property. (*Cottle, supra*, 3 Cal.App.4th at p. 1371.) The Court of Appeal affirmed the trial court's order precluding plaintiffs from putting on evidence at trial that their personal injuries were caused by exposure to chemicals at the residential subdivision. The Court of Appeal concluded that the plaintiffs were required to put on some expert testimony on causation, and explained: "Had petitioners presented evidence that the chemicals in the ground at the Dunes were in some degree a cause of petitioners' physical injuries to a degree of reasonable medical probability, then there would have been a factual question for the jury to resolve." (*Id.* at p. 1385.) This toxic tort case pre-dates *Rutherford,* and was not discussed in *Rutherford*, thus it presents no clarification of the *Rutherford* standard as it applies in asbestos cases.

its Health and Safety Code to ban the sale of asbestos spray construction products. Appellant alleges that respondents lobbied for an exemption from this rule, despite the fact that it knew asbestos exposure was hazardous.[7]

The trial court granted respondent's motion to exclude evidence of its lobbying and petitioning activities, holding that "[n]o evidence of lobbying activity or any other advocacy before the state Legislature will be allowed . . . ." The court's ruling was based on "the *Noerr-Pennington* doctrine and the California cases thereon."[8]

### A. *Standard of review*

A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201). Abuse of discretion may be found if the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) In addition, evidentiary rulings which are based on a misunderstanding of the law are an abuse of discretion. (See, e.g., *Brown v. County of Los Angeles* (2012) 203 Cal.App.4th 1529, 1534-1535.)

---

[7]    The items of evidence at issue were, among other things:  a letter to a state senator, dated August 6, 1975, requesting a meeting to discuss scientific studies regarding the hazards of asbestos; and inter-office correspondence, dated June 4, 1975, referring to the results of meetings with various elected officials.

[8]    The parties suggest that the trial court's ruling was also based, in part, on Code of Civil Procedure section 425.16 (the anti-SLAPP statute).  However, there is no indication that the anti-SLAPP statute formed a basis for the trial court's ruling, therefore we decline to address it.  While the trial court did discuss the anti-SLAPP statute, it indicated that the discussion was "just a little footnote on the SLAPP statute to show that our Legislature's particularly concerned with people being sued."  The court made it clear that the "ruling is not changing on *Noerr-Pennington*."  However, we note that the anti-SLAPP statute does not provide a ground for exclusion of evidence in a products liability action.  Instead, it provides that a cause of action is subject to a special motion to strike if the cause of action (1) arises from protected speech; and (2) lacks minimal merit. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 87-89).  The anti-SLAPP statute is not a rule of evidence, and is not designed to prohibit admission of relevant evidence in trials where the causes of action alleged are not based on protected speech.

### B. The Noerr-Pennington *doctrine*

"The *Noerr-Pennington* doctrine provides that there is no antitrust liability under the Sherman Act for efforts to influence government which are protected by the First Amendment right to petition for redress of grievances, even if the motive behind the efforts is anticompetitive. [Citations.]" (*Hi-Top Steel Corp. v. Lehrer* (1994) 24 Cal.App.4th 570, 575 (*Hi-Top*).) The doctrine originated with the United States Supreme Court case *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.* (1961) 365 U.S. 127 (*Noerr*). In *Noerr*, plaintiff truckers alleged a conspiracy in restraint of trade in violation of the Sherman Act by the defendant railroads. In sum, the truckers alleged that the railroads had conducted a campaign to foster legislation designed to destroy the trucking industry as a competitor. (*Id.* at pp. 131-132.) The Supreme Court concluded that the Sherman Act is not violated by attempts to influence the passage or enforcement of laws. (*Id.* at p. 135.) Nor could the Sherman Act prohibit associations from attempting to persuade the Legislature or the executive branch to take actions with respect to laws that would result in restraint of trade. (*Id.* at p. 136.) In particular, since the Bill of Rights protects the right of petition, the Sherman Act could not be interpreted to invade this right. (*Id.* at p. 138.)

*United Mine Workers v. Pennington* (1965) 381 U.S. 657 (*Pennington*) was an antitrust case brought by small coal mine operators who opposed an industry-wide collective bargaining agreement on the ground that it was an illegal attempt to force some employers out of business. The larger coal companies and the union jointly and successfully approached the Secretary of Labor to obtain a minimum wage for companies selling to the Tennessee Valley Authority -- a wage much higher than many smaller companies could afford to pay. (*Id.* at pp. 659-660.) The *Pennington* court clarified the meaning of the holding in *Noerr*, holding that "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." (*Pennington, supra*, at p. 670.) The high court concluded, "Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate

20

competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." (*Ibid.*)

Thus, the *Noerr-Pennington* doctrine is a doctrine of substantive law which shields defendants from liability based on their legitimate right to petition government officials. While the *Noerr-Pennington* doctrine "was formulated in the context of antitrust cases," it has been applied in cases involving other types of civil liability, including cases regarding interference with contractual relations or prospective economic advantage, and unfair competition. (*Hi-Top, supra*, 24 Cal.App.4th at pp. 577-578.)

However, the *Noerr-Pennington* doctrine is not a rule of evidence. As the Supreme Court clarified in *Pennington*:

> "It would of course still be within the province of the trial judge to admit this evidence [of efforts to influence public officials], if he deemed it probative and not unduly prejudicial, under the 'established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny.' [Citation.] [Citations.]"

(*Pennington, supra*, 381 U.S. at p. 670, fn. 3.)

In other words, while a corporation's petitioning of government officials may not itself form the basis of liability, evidence of such petitioning activity may be admissible if otherwise relevant to show the purpose and character of other actions of the corporation.

Federal courts have confirmed that the *Noerr-Pennington* doctrine is not a rule of evidence. For example, in *In re Brand Name Prescription Drugs Antitrust Litigation* (7th Cir. 1999) 186 F.3d 781, 789, Judge Posner wrote for the Seventh Circuit: "The district judge thus erred in . . . treating the [*Noerr-Pennington*] doctrine as a rule of evidence that forbids the introduction of evidence . . . relating to efforts to obtain governmental protection . . . . Such evidence can be excluded under [Federal Rules of Evidence, rule] 403 if confusing or unduly prejudicial, [citation], but there is no blanket rule of inadmissibility." (See also *Wolfe v. McNeil-PPC, Inc.* (E.D.Pa. Jan. 6, 2012, Civ. No. 07-

21

348) 2012 U.S. Dist. LEXIS 2160 at *17-19 [rejecting defendants' argument that the *Noerr-Pennington* doctrine compelled exclusion of two petitions submitted to the FDA, and noting that the defendants were unable to "identify a single case in which a court applied *Noerr-Pennington* to exclude evidence"]; *Mason v. Texaco, Inc.* (D.Kan. 1990) 741 F.Supp. 1472, 1500-1501 [refusing to exclude evidence of positions taken by Texaco with respect to OSHA's efforts to lower exposure limits to benzene on the basis of the *Noerr-Pennington* doctrine, noting that "courts have invoked the doctrine only where the cause of action itself is based on the act of lobbying or filing a lawsuit"].) We find these cases to be persuasive, and agree that the *Noerr-Pennington* doctrine does not create a rule of evidence that forbids the introduction of evidence of governmental petitioning activity in this case.[9]

### C. The trial court abused its discretion by relying on **Noerr-Pennington** *to exclude evidence of governmental petitioning activity*

Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and is considered an abuse of discretion. (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393.) In addition, when a trial court misunderstands or misapplies the applicable legal standard, it has not properly exercised its discretion. (*People v. Millard* (2009) 175 Cal.App.4th 7, 31.)

The trial court's reliance on the *Noerr-Pennington* doctrine to exclude evidence in this negligence/strict liability case is a misapplication of the doctrine. As discussed above, the *Noerr-Pennington* doctrine shields defendants from liability for their actions in petitioning government officials. It does not provide a basis for exclusion of *evidence* of lobbying activities that might be relevant to show a defendant's knowledge of the

---

[9] Though we are not bound by federal authority, we may consider it persuasive on issues of federal or constitutional law. (*Tichinin v. City of Morgan Hill* (2009) 177 Cal.App.4th 1049, 1064, fn. 7 ["Many of the *Noerr-Pennington* cases are decisions from lower federal appellate and district courts. 'While we are not bound by decisions of the lower federal courts, even on federal questions, they are persuasive and entitled to great weight.' [Citations.]"].)

dangerous nature of its product or a failure to exercise ordinary care. The evidentiary ruling is therefore reversed.

The parties have set forth in their briefs competing arguments as to whether the evidence at issue is relevant, probative, and/or unduly prejudicial. Because the trial court made no analysis of this evidence pursuant to Evidence Code sections 350, 352, or any other relevant section of the Evidence Code, we decline to address these arguments. We make no assessment of the relevance, probative value, or prejudicial nature of the evidence at issue. These arguments should be made in the trial court on remand.

**DISPOSITION**

The judgment is reversed. Appellant is awarded costs of appeal.

**CERTIFIED FOR PUBLICATION**


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.*
FERNS


_____
\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.