Filed 11/26/25 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| KARINAH JIMENEZ et al.,<br><br>    Plaintiffs and Appellants,<br><br>          v.<br><br>HAYES APARTMENT HOMES,<br>LLC, et al.,<br><br>    Defendants and Respondents. | A170198<br><br>(Alameda County<br>Super. Ct. No. 22CV004962)<br><br>ORDER MODIFYING OPINION;<br>NO CHANGE IN JUDGMENT |

BY THE COURT:

    The court orders that the opinion filed in this appeal on November 7, 2025, be modified as follows:

    **1.** On page 12, in footnote 4, the second paragraph beginning "*Rowland* was partially superseded" is deleted.


The modification effects no change in the judgment.


Dated: November 26, 2025                  BROWN, P. J.

1

Trial Court:      Superior Court of California, County of Alameda

Trial Judge:     Hon. Frank Roesch

Counsel:        Trial Lawyers for Justice, Clinton E. Ehrlich-Quinn, Dan
Schaar and Eva Silva for Plaintiffs and Appellants.

Horvitz & Levy, Steven S. Fleischman, Scott P. Dixler,
Jasjaap S. Sidhu; Lewis Brisbois Bisgaard & Smith,
Joseph A. Salazar, Jr., and Ryan Matthews for Defendants
and Respondents.

Filed 11/7/25 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| KARINAH JIMENEZ et al., Plaintiffs and Appellants, v. HAYES APARTMENT HOMES, LLC, et al., Defendants and Respondents. | A170198 (Alameda County Super. Ct. No. 22CV004962) |

In July 2016, four-year old Karinah Jimenez and her two-year old brother Isaiah (collectively plaintiffs) fell out of the second-floor bedroom window in the apartment where they lived with their mother. Both children sustained severe injuries; Isaiah partially recovered, but Karinah never did and suffers from permanent brain damage. Through Shary Marquez, their guardian ad litem, Isaiah and Karinah brought suit against Hayes Apartment Homes, LLC (Hayes), the property owner, and its property manager, Preferred Property Management, Inc. (collectively defendants).

The complaint pleaded negligence under two theories, one based on general negligence and one based on negligence per se. Alleging that the bedroom window from which they fell presented a foreseeable risk of harm to child tenants, plaintiffs claimed that defendants breached a duty of care to them, proximately causing their injuries. In addition, plaintiffs alleged that, in renovating the apartment building shortly before the accident, defendants

1

violated the California Building Standards Code[1] by installing their bedroom window without a fall prevention device. That code violation, plaintiffs alleged, constitutes negligence per se and was another proximate cause of their injuries. The case proceeded to trial on both negligence theories, and following the close of plaintiffs' case, the trial court granted a nonsuit motion. Plaintiffs now appeal from the ensuing judgment.

To the extent the complaint pleaded general negligence, we conclude nonsuit was properly granted. Because, on this record, there was no foreseeability of harm to plaintiffs, their general negligence claim fails for lack of any showing of duty. To the extent the complaint pleaded negligence per se, we conclude nonsuit was improper. The court found that, under section 3404.1.1, defendants were exempt from the requirement under section 1013.8 that they install a fall prevention device on operable upper floor windows. The crux of this ruling was that the plaintiffs' bedroom window was code-compliant without a fall protection device when the

---

[1] All further undesignated section references are to the California Building Standards Code, at title 24 of the California Code of Regulations. These regulations, which we refer to as the Building Code or the Code, are promulgated by the Department of Housing and Community Development (HCD). Because the Building Code is updated tri-annually by the HCD, we may also refer to it as the 2013 Building Code, the operative version at the time the apartment renovation at issue here took place. The entire 2013 Building Code (which is not available via conventional electronic publication sources for legal materials such as Lexis or Westlaw but may be found by hyperlink on the website of the California Building Standards Commission of the Department of General Services (see <https://www.dgs.ca.gov/bsc/codes>) was submitted to us in a series of exhibits presented by stipulated request for judicial notice, which we granted. On the eve of oral argument, defendants asked that we also take judicial notice of sections 702 and 702.4 of the 2022 California Existing Building Code, which is an appendix to the 2022 Building Code. We deny this latter request for failure to comply with rule 8.254, subdivision (a), of the California Rules of Court.

2

apartment building was originally constructed, and all defendants did in replacing the window was make an "alteration" using "like-for-like" "original building materials." We hold that that interpretation of the 2013 Building Code was incorrect.

Accordingly, we affirm in part, reverse in part, and remand for retrial on plaintiffs' surviving claim of negligence per se.

## I. BACKGROUND

At the time of the accident, plaintiffs lived in Lodi, California, with their mother, Marlina Guerrero, in one of the rental units in Blakely Townhomes. Blakely Townhomes was constructed in 1980. The parties agree that the property met all relevant Building Code requirements at that time. Hayes did not construct the building originally, but rather purchased the building in early 2016.

### A. *Pretrial Motions*

In an effort to defeat plaintiffs' claim of negligence per se, defendants moved for summary adjudication prior to trial, contending that because Blakely Townhomes complied with the operative Building Code when it was constructed in 1980, section 3404.1.1 in the 2013 Building Code exempted them from any new requirements because of how "minor, like-for-like alterations [are]." The trial court rejected the argument because, even if defendants showed that they were not required to comply with the 2013 Building Code and thus were not negligent per se, that would not dispose of the entirety of plaintiffs' negligence cause of action, since the claim also rested on a general negligence theory.

Defendants mounted another attack on plaintiffs' negligence per se claim at trial, this time by motion in limine. They sought to block evidence offered in support of the negligence per se theory by moving to bar plaintiffs' experts from giving testimony referring to section 1013 of the Building Code.

3

This section of the Building Code, titled "Guards," includes requirements for safeguards on open-sided walking surfaces such as mezzanines, equipment platforms, stairs, ramps and landings, and certain windows. (§ 1013.) Among these safeguards, in a section titled "Window sills," is a fall prevention device requirement for operable windows. (§ 1013.8.) Under section 1013.8, the "[o]perable sections of windows" covered by this requirement "shall not permit openings that allow passage of a 4-inch-diameter . . . sphere." (§ 1013.8.)

Defendants took the position below that, because what they call the "like-for-like" clause in the 2013 Building Code "allows [building alterations] to conform . . . to the old code and be appropriate[,]" they were not obligated to install a fall prevention device on plaintiffs' bedroom window. The trial court denied the motion, finding that the issue of whether the window constituted a "like-for-like" replacement was a factual question. The court reasoned that experts could testify as to "what happens in the field and how people in the industry understand a particular code section."

B. *Plaintiffs' Evidence*

### 2. The Building and Its Renovation

After purchasing Blakely Townhomes in 2016, Hayes applied for and was issued a building permit to undertake renovations of the building. These renovations included the replacement of 27 windows with upgraded glass to reflect current energy efficiency requirements in the Building Code. The renovated windows also featured new vinyl framing, replacing the old aluminum framing. At the time of the accident, the version of the operative Code was the 2013 Building Code.

The second floor of Blakely Townhomes apartment building housed the plaintiffs' bedroom, a bathroom plaintiffs shared with Guerrero, and Guerrero's bedroom. From its window sill to the floor in the plaintiffs'

4

bedroom, the height of the bedroom window measured 35 11/16 inches, or just shy of three feet. The height from the window to the pavement below outside measured 12 feet 7 inches.

Throughout the course of the renovations, Hayes did not install fall prevention devices on the replaced upper floor windows. These devices, designed to restrict the opening of windows to no more than a four-inch diameter sphere, can cost as little as $44 and rarely cost more than $100. Hayes reportedly spent $165,000 on renovations within three months of purchasing the property. Hayes also did not review the 2013 Building Code prior to installing the windows to ensure that they were compliant with the Code's current requirements.

### 3. The Accident

The accident occurred a few months after the renovations began. The facts surrounding the accident, as recounted in Guerrero's testimony, are as follows.

On the day of the accident, four adults were in the Guerrero apartment. Guerrero, Karinah, and Isaiah were on the second floor, inside the children's bedroom. Guerrero saw that the bedroom window was open. She planned to give Karinah and Isaiah a bath, so she decided to close the window while she left to draw the bath and told the children to stay away from it. When Guerrero closed the window, she did not see a ladder or a worker outside of the apartment.

Guerrero then left the children's bedroom and went into the bathroom to run the bathwater. The bathroom was about seven steps away from the children's room. Waiting for the bathwater to heat up, Guerrero retrieved clothes and towels for the children, then reentered the bathroom. She did not close the bathroom door, but it closed on its own, as it frequently did.

5

Guerrero then heard a "big boom," which turned out to be the sound of the children falling from their bedroom window.

Following the accident, Karinah was taken into surgery for an emergency decompressive craniectomy, then put in a medically induced coma for several weeks. She later had two surgical cranioplasties, but now suffers from permanent cognitive disability due to irreversible brain injury. Isaiah too suffered a brain injury but did not require surgery. He was discharged from the hospital after about one week.

### 4. Other Testimony at Trial

#### a. *Bryan Swiers's Testimony*

Bryan Swiers, a worker for Hayes, testified that he was replacing light fixtures outside the Guerrero apartment at the time of the accident. He stated there were 5 to 10 other tradesmen at the property. When Swiers arrived at his worksite, he saw the children almost immediately. The children were in the window for almost the entire time Swiers was there working, which was about 5 to 10 minutes. From the time Swiers first saw the children to the time they fell, only a couple of minutes passed. There were no other workers in the apartment's enclosed area when the children fell.

Swiers replaced five or six light fixtures on the apartment's exterior. He started his work on the ground level, used a ladder to access the balcony area to the right of the subject window, and changed a light on the back porch. Swiers never physically entered the plaintiff's balcony area. Swiers did not recall specifically saying "hi" to the children, nor did he recall anyone else specifically saying "hi" to them. Swiers stated, "I remember I was working on a balcony to the right and putting a light up. And there were people walking by. And the kids were trying to get anyone's attention who was walking by." While working on the "balcony to the right," Swiers' view

6

faced away from the apartment building, so Swiers could not see directly into the plaintiff's window.[2]

Swiers testified that he saw the plaintiffs standing on a dresser in the window so that he could "see their full bodies." Swiers recalled saying something over the fence, like, "Hey, your kids are in the window. You guys should probably get them out." Swiers testified that he heard "a parent yelling upstairs," something to the effect of, "get out of the window." But Swiers did not recall anyone inside the apartment physically going up to the plaintiffs' bedroom and asking them to get down. Swiers stated that the activity he saw was not so dangerous that he felt compelled to physically remove the children from the window himself.

While on the back porch, Swiers heard a thud—the sound of Karinah falling from the window. Swiers got off the ladder and saw Isaiah fall and land in the apartment's fenced-in area.

b. *Expert Testimony on Building Code Compliance*

Plaintiffs called multiple witnesses to address how people in the building and construction industry understand the Building Code and industry practices. The first of these witnesses, Zachary Moore, a safety and forensic engineer, gave expert testimony on "all industry standards say to use fall prevention" on windows like the subject window. Moore stated that the subject window was a hazard and required a safeguard.

---

[2] The exact proximity of Swiers's worksite to the plaintiffs' bedroom window is unclear from the record. While Swiers testified to working "on the balcony to the right" of the apartment, his testimony does not clearly identify the location or chronology of the events as they occurred. It is still unclear which apartment Swiers was performing work on before and during the incident, whether Swiers was in the plaintiff's fenced-in area at the time the children fell, and whether the window was open while Swiers was working.

According to Moore, the 2013 Building Code includes requirements that are designed to prevent children from being killed or injured by falling out of unsecured windows. Specifically, the Code requires that a window block a sphere with a diameter of four inches from passing through it if: (1) the bottom of the window is less than three feet from the floor and (2) the fall distance from the window to the ground is six feet or more. Moore explained that the four-inch number was chosen to represent the size of a child's head.[3]

Plaintiffs then called Bobby Vrabel, an expert presented as "the person most knowledgeable on anything that has to do with [building] plan review with the City [of Lodi]." Vrabel was also the individual responsible for inspecting the renovations at Blakely Townhomes. Vrabel testified that, as he understood the Code, the plaintiffs' bedroom window should have had window safeguards. Finally, plaintiffs called Lonnie Haughton, a certified construction consultant, who testified that, "if you alter part of an existing building, your alteration has to comply with the current [C]ode" in the same way a new construction must. Haughton also opined that a window "[is] a product. It's made of a material, but it's a window product."

## C. *Nonsuit Granted*

After plaintiffs rested, defendants moved for a directed verdict. The trial court treated defendants' motion as a motion for nonsuit, granting it as to the entire complaint. The court reasoned that "the installation of the replacement windows in place of the aluminum window did not require a

---

[3] Moore testified, although the fall prevention rule for operable windows was adopted in 2010, it reflects industry standards for new construction that had been adopted decades earlier. He stated that those standards were based on studies showing that children were disproportionately likely to fall out of windows whose openings were low to the floor.

window guard because it is a replacement that is described within [section] 3404.1.1." As to plaintiffs' general negligence claim, the court reviewed Moore's testimony and was not persuaded his testimony established that any industry standard required installation of a fall prevention device, independent of the Building Code. The court also questioned whether adequate proof of causation had been presented, pointing out that "the only evidence so far is that the children were on top of a dresser and fell through the window." But in the end, no one disputes that the court based its ruling on lack of duty, not lack of causation.

Following entry of judgment against them, plaintiffs filed a timely notice of appeal.

## II. DISCUSSION

We begin with the applicable standard of review. The review of a grant of nonsuit is de novo. (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541–1542.) "The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor." (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117–118.) This grant is only "appropriate where the plaintiff's proof raises nothing more than speculation, suspicion or conjecture." (*Hernandez v. Amcord, Inc.* (2013) 215 Cal.App.4th 659, 669.)

In evaluating whether plaintiffs' evidence would support a jury verdict in their favor, we review the record for substantial evidence. Evidence is substantial if it is reasonable, credible, and of solid value. (*Fresh Express Inc. v. Beazley Syndicate 2623/623 at Lloyd's* (2011) 199 Cal.App.4th 1038, 1055.) "The appellate court evaluates the evidence in the light most favorable to the plaintiff." (*Hernandez v. Amcord, Inc., supra,* 215 Cal.App.4th at p. 669.) This means " 'the evidence most favorable to plaintiff must be accepted as

9

true and conflicting evidence must be disregarded.' " (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214.)

Accepting that plaintiffs presented sufficient evidence for a jury to resolve all disputed issues of fact in their favor and assuming that a jury so found, did they present enough evidence to support a claim of negligence liability as a matter of law?  For each of the two negligence theories presented here, we reach different conclusions.  The answer is no as to general negligence, but yes as to negligence per se, so the case must be remanded for retrial.

### A. *General Negligence*

Plaintiffs' complaint alleges that defendants were negligent in "installing, maintaining, managing, operating, and owning the subject window," and that defendants "had specific and direct knowledge of the unreasonable dangers posed by the window but failed to provide a warning to Plaintiffs."

Citing *Brooks v. E. J. Willig Truck Transp. Co.* (1953) 40 Cal.2d 669, 680, plaintiffs advance three arguments in support of this claim, each focusing on different acts or omissions.  They contend that defendants were negligent in failing to install window fall prevention devices per industry standards and despite knowledge that children lived in the apartment.  They also allege that defendants were negligent in sending a worker to perform repairs on the exterior of the apartment without notice.  Finally, they contend that Swiers was negligent in continuing the repair work after he saw plaintiffs playing in the window.

Each of these alleged acts or omissions may reasonably be regarded as part of the installation, maintenance, management, operation, or ownership of plaintiffs' bedroom window.  Under that broad heading, alleged failure to comply with industry standards requiring window safeguards along with

10

actual knowledge that children lived in the apartment may reasonably qualify as negligent installation. And the allegations that defendants scheduled repair work without notice and failed to stop performance of that work leading up to the incident qualify as negligent maintenance. But even granting all that, none of it alone is enough to sustain a claim of general negligence. To succeed in making these acts or omissions the predicate for a viable negligence claim, defendants must establish the defendants owed them a duty of care. (*John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1188.)

The existence of a duty is a question of law to be resolved by the court. (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213.) Section 1714 of the Civil Code provides that "[e]veryone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person." (Civ. Code, § 1714, subd. (a).) Thus, " ' "California law establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others." ' " (*T.L. v. City Ambulance of Eureka, Inc.* (2022) 83 Cal.App.5th 864, 875.) The courts have repeatedly declared the existence of a duty by landowners to maintain property in their possession and control in a reasonably safe condition. (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 278; see *Rowland v. Christian* (1968) 69 Cal.2d 108.)[4] But

---

[4] The oft-repeated *Rowland* test for determining the *existence* of a landlord's duty of care to invited guests of tenants injured by conditions requires the "balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability,

"acknowledgment of the broad proposition that landowners have a duty to exercise reasonable care . . . provides scant guidance to a court that must determine the existence of the landlord's duty in a particular case." (*Vasquez,* at p. 279.)

"Thus, the question of a landlord's duty is *not* whether a duty exists *at all*, but rather what is the *scope* of the landlord's duty given the particular facts of the case?" (*Vasquez v. Residential Investments, Inc.*, *supra*, 118 Cal.App.4th at p. 280, original italics.) In answering that fact-bound question, a court "should limit its inquiry to the specific action the plaintiff claims the particular landlord had a duty to undertake," because "[o]nly after the scope of the duty under consideration is defined may a court meaningfully undertake the balancing analysis of the risks and burdens." (*Ibid*.) The court must balance "the foreseeability of the harm" against "the burden on the landlord created by the duty." (*Ibid.*)

In cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. (*Castaneda v. Olsher*, *supra*, 41 Cal.4th at p. 1213.) In cases " ' " 'where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser

---

cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian*, *supra*, 69 Cal.2d at p. 113.) In announcing this multifactor test, *Rowland* discarded decades of rigid common classifications among "invitees, licensees, and trespassers" that often led to harsh results. (*Id*. at pp. 116–120.) And it did so, notably, in a case where the particular hazard involved—a cracked knob on a bathroom sink that severely cut an invited guest—had been brought to the attention of the landlord, who knew there was a need for repair. (*Id*. at p. 110.)

*Rowland* was partially superseded by statute on a different issue as stated in *Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 722, which was in turn disapproved of regarding another issue in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19. (*Smith v. Freund* (2011) 192 Cal.App.4th 466, 473, fn. 5.)

degree of foreseeability may be required.' " ' " (*Ibid.*)  Finally, in cases that concern injuries to small children, we must be mindful that a " 'greater degree of care is generally owed to children because of their lack of capacity to appreciate risks and avoid danger.' " (*Lawrence v. La Jolla Beach & Tennis Club, Inc.* (2014) 231 Cal.App.4th 11, 24 (*Lawrence*).)

While the issue is close given the relatively modest cost of taking a simple step to minimize the hazard by installing a fall prevention device, the defendants' inattention to the requisites of the 2013 Code, and the fact we are dealing with injuries to young children, we agree with the trial court that the claim of general negligence fails on this record for lack of a showing of duty. Under all three variations of plaintiffs' general negligence theory, the stumbling block is foreseeability.

Guerrero appears to have appreciated the risk here, since she closed the window and warned the children to stay away from it.  That weighs against foreseeability on the landlord's part.  (See *Montes v. Young Men's Christian Assn. of Glendale, California* (2022) 81Cal.App.5th 1134, 1140 [foreseeability of harm " 'is typically absent when a dangerous condition is open and obvious' "].)  There is also no indication, say from prior accidents, that the landlord was on notice of the hazard.  (*Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 308 [holding harm was not foreseeable even though it was a "logical possibility" because "nothing put the defendants on notice a visitor might be injured"].)  Even assuming the failure to install a fall prevention device in the upper floor window of an apartment where children lived was a violation of industry standards, or that the sending of a worker without notice heightened the degree of risk, or that Swiers should have been more proactive once he saw children in peril, the connection between the

negligent acts or omissions here and the injuries to these plaintiffs is too attenuated to justify a finding of duty for purposes of common law negligence.

Plaintiffs cite *Lawrence, supra*, 231 Cal.App.4th 11, and *Amos v. Alpha Property Management* (1999) 73 Cal.App.4th 895, 897, two cases in which negligence claims were sustained against property owners in circumstances broadly similar to the scenario in this case. In *Lawrence,* a child fell from a second-floor window in a beachfront hotel room. (*Lawrence, supra*, 231 Cal.App.4th at p. 17.) The sill height there was 25 inches above the floor. (*Id*. at p. 29.) It was foreseeable that "guests in defendants' oceanfront hotel rooms will open windows to let in ocean breezes and enjoy the sound of the ocean, and that a five-year-old child will stand on the sill of a window that [low]." (*Ibid*.) The sill of the window in *Amos* was 28 inches from the floor, and the landlord knew that the window, which was in a building common area, was routinely left open. (*Amos*, at p. 897.) Suffice it to say that the predictability of the hazard to the small children in these cases, one involving a publicly-accessible space and the other a hotel open for public accommodation, was greater than we can say it was in this case, where the accident occurred in a private apartment.

Nothing in the record indicates that the presence of Swiers was anything other than a one-time event or that he or his employer knew children would be near his worksite on the day of the accident. Contrast that with both *Amos* and *Lawrence*, where there were well-known conditions equivalent to an attractive nuisance that could foreseeably lead children to endanger themselves. Both of those cases also involved open windows, and in each the height of the sill was lower to the floor than it was in our case. The trial court highlighted what we agree is the most material fact here. Without something to use for climbing assistance—on our facts, that appears to have

14

been a dresser—the plaintiffs would not have been standing in the window sill.  The defendants were not in a position to know the layout of the furniture in a private apartment or that unattended children might gain access to and manage to open a closed second-floor bedroom window.

Defendants are correct that, in a private apartment scenario, the building owner lacks control over many things that affect the degree of risk, one of which is furniture placement.  *Pineda v. Ennabe* (1998) 61 Cal.App.4th 1403 is instructive.  There, a mother placed a bed under a window in her apartment, and her child later climbed onto the bed and fell out of the window.  The plaintiffs emphasized that the landlord knew children lived in the apartment.  (*Id.* at p. 1406.)  But the court declined to impose a duty on the landlord to place bars on the window.  (See *id.* at pp. 1408–1409.)  The court focused on the amount of control that parents, as tenants, have in their apartment, and noted that a duty to safeguard against open windows would extend to "other apartment hazards posed by lack of parental supervision." (*Id.* at p. 1408.)  Said the court, "[t]here was little likelihood that respondent's failure to place warning labels or latches on the window screens would cause an accident of the kind which occurred here, unless the parent was negligent." (*Ibid.*).

The court also noted that bars or other devices "might reduce the risk of falling out but create a new, serious risk of trapping occupants during a fire," and a "legally imposed duty to install bars could cause as much harm as it avoided." (*Pineda v. Ennabe*, *supra*, 61 Cal.App.4th at p. 1408.)  The court emphasized that the "purpose for requiring a duty as a precondition to negligence liability, and for requiring the *court* to delineate the boundaries of the duty, is to avoid the extension of liability to every conceivably foreseeable accident, without regard to common sense or good policy." (*Id.* at p. 1409.)

15

"Common sense and good policy militate against requiring landlords to provide a safety net to reduce risks fundamentally caused by careless parents." (*Ibid.*)[5]

We conclude that this case is more akin to *Pineda* than it is to *Amos* and *Lawrence*. The unusual circumstances surrounding the accident here do not support recognition of a duty of care.

**B. *Negligence Per Se***

The elements of negligence per se in a case involving alleged breach of a regulation are that: (1) the defendant violated the regulation; (2) the violation proximately caused the injury; (3) the injury was of the type that the regulation was intended to prevent; and (4) the person suffering the injury belonged to the class of persons whom the regulation was adopted to protect. (*Lua v. Southern Pacific Transportation Co.* (1992) 6 Cal.App.4th 1897, 1901 (*Lua*).)

"In order for a claim of negligence per se to succeed, all four elements must be shown." (*Lua*, *supra*, 6 Cal.App.4th at p. 1901.) Agreeing with defendants, the trial court ruled that the first element is missing here because, when the renovation of Blakely Townhomes took place, the "original materials" exemption in section 3404.1.1 excused them from any obligation to install a fall prevention device on plaintiffs' bedroom window.

Plaintiffs argue the "original materials" exemption in section 3404.1.1 does not apply because a window is not a "material[]" and that defendants

---

[5] While evidence of parental negligence can have a role in analyzing the legal scope of a landlord's duty, as illustrated by *Pineda*, it is worth pointing out given the trial court's side comments about causation that *Pineda*'s duty analysis does not control questions of causation or damages. (See *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578; *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804.)

16

were therefore required to install a fall prevention device under section 1013.8. Defendants, on the other hand, argue that nothing in the Building Code precludes interpreting a window to be a "material[]," and if it qualifies as such, they were not out of compliance with section 1013.8 because of the exemption in section 3404.1.1.

The pivotal negligence per se question raised by this appeal is this: Did the bedroom window constitute an "original material[]" within the meaning of the Building Code? If the answer to that question is yes, the section 3404.1.1 exemption applies. Our answer is no.

### 1. The Building Code

As noted above, the Building Code is codified by HCD regulation. (See *Building Industry Assn. v. City of Livermore* (1996) 45 Cal.App.4th 719, 728.) It is based on "international or uniform industry codes" promulgated by organizations such as the International Code Council. (Health & Safety Code, § 17922, subd. (a).) The HCD can amend these internationally standard codes. (See *id.*, § 17922, subd. (b) ["[i]n adopting building standards," the HCD shall consider "any amendments to the international or uniform codes"].) And section 3404.1.1 is such an amendment.

Section 3404.1.1, which was promulgated by the HCD in 2010, provides as follows: "Local ordinances or regulations shall permit the replacement, retention and extension of original materials, and the use of original methods of construction, for any building or accessory structure, provided such building or structure complied with the building code provisions in effect at the time of the original construction and the building or accessory structure does not become or continue to be a substandard building."[6]

_____

[6] Section 3404.1.1 appears to be the HCD's regulatory implementation of a statute, Health and Safety Code section 17958.8, which provides, "Local

17

## 2. Principles of Interpretation and the Applicable Building Code Provisions

In interpreting statutory language, courts begin " 'with the fundamental rule that [its] primary task is to determine the lawmakers' intent.' " (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082.) " 'Under well-established rules of statutory construction [to effectuate the purpose of the law,] . . . we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context' " with " 'the whole system of law of which it is a part. . . .' " (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663.)[7]

If an initial consultation of text is insufficient to reveal statutory intent based on plain meaning, "the courts may turn to rules or maxims of construction 'which serve as aids . . . about conventional language usage.' " (*Id*. at p. 663.) Legislative history is one aid to determining uncertain meaning. (*Ibid*.) Another is a "statute's purpose" and the "public policy" it seeks to further. (*In re Ja.O.* (2025) 18 Cal.5th 271, 283.) Even though the

---

ordinances or regulations governing alterations and repair of existing buildings shall permit the replacement, retention, and extension of original materials and the use of original methods of construction . . . as long as the portion of the building and structure subject to the replacement, retention, or extension of original materials and the use of original methods of construction complies with the building code provisions governing that portion of the building or accessory structure at the time of construction . . . and the building or accessory structure does not become or continue to be a substandard building."

[7] See *People v. Arroyo* (2016) 62 Cal.4th 589, 595 [" '[courts] must harmonize "the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole." ' "]; *Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 690 [indicating courts avoid statutory interpretation that renders any language surplusage].

Building Code is a set of regulations, not a statute, conventional principles of statutory interpretation govern our approach to its interpretation. (See *Lippman v. City of Oakland* (2017) 19 Cal.App.5th 750, 760.)

Because our interpretative task focuses on the interplay between Section 3404.1.1 and a series of other Building Code provisions in section 1013 requiring the installation of fall prevention devices in operable windows absent some exemption, we begin by locating section 3404.1.1 within the structure of the Code as a whole, and then we turn to section 1013.

Section 3404.1.1 may be found in chapter 34, governing "Existing Structures." (§ 3401 et seq.) Chapter 34 addresses, among other things, changes to buildings, including alterations, "erected prior to the date of adoption of the appropriate code, or one for which a legal building permit has been issued." (§ 202 [definition of "BUILDING, EXISTING"].) Within chapter 34, we find section 3401, "General," section 3404, "Alterations," and section 3405, "Repairs." (§§ 3401, 3404, 3405.)

Section 3404.1, the "General" section in 3401, provides, "Except as provided by Section 3401.4 or this section, alterations to any building or structure shall comply with the requirements of the code for new construction," and "shall be such that the existing building . . . is no less complying with the provisions of this code than the existing building . . . was prior to the alteration." Section 3404.1.1 is nested within section 3404.1.

Section 3404.1.1 and all other provisions in chapter 34 addressing "Existing Structures" must be read in light of definitions provided by the Building Code generally. The term "Alteration" is defined to be "[a]ny construction or renovation to an existing structure other than a repair or addition," as distinguished from a "Repair," which is "[t]he reconstruction or

19

renewal of any part of an existing building for the purpose of its maintenance." (§ 202.)[8]

Also centrally relevant here, as noted, is a series of three interrelated clauses under section 1013—section 1013.1, titled "Guards", section 1013.8, titled "Window sills," and 1013.8.1, titled "Window control devices." (§§ 1013.1, 1013.8, 1013.8.1.) Section 1013.1 states generally that "[o]perable windows with sills located more than 72 inches (1.83 m) above finished grade or other surface below shall comply with Section 1013.8." (§ 1013.1.) That much is easy to understand, but the application of section 1013.1 on the facts presented here requires careful parsing.

Section 1013.8 states specifically that, in residentially-zoned single-family and multifamily buildings, where the "opening of the sill portion of an operable window is located more than 72 inches (1.83 m) above finished grade or other surface below, the lowest part of the clear opening of the window shall be at a height not less than 36 inches (915 mm) above the finished floor surface of the room in which the window is located." (§ 1013.8.) Section

---

[8] Generally, an "Alteration[]" must comply with the standards for new construction, while a "Repair[]" need not. (§§ 3404, 3405.) Near the end of their responding brief, defendants contend that the proper legal classification of their replacement of plaintiffs' bedroom window when the Blakely Townhomes were renovated in 2016 is a "Repair," not an "Alteration." Plaintiffs argue in reply that this is a change of position and that, in the trial court, the defendants conceded the replacement of plaintiffs' bedroom window was an alteration. Defendants acknowledge that they did not raise the issue in the trial court but ask us to exercise our discretion and address the issue in the first instance on appeal because, they say, it is a "pure question of law." We choose not to do so. As the plaintiff's correctly point out, whether the window replacement was a "Repair" depends on whether it was performed on "an existing building *for the purpose of its maintenance.*" (§ 202, italics added.) That is a factual question which we decline to consider for the first time on appeal. (*Rogers v. County of Los Angeles* (2011) 198 Cal.App.4th 480, 490, fn. 6.) We deem the issue waived.

20

1013.8 then sets forth a set of requirements for how wide operable windows covered by section 1013.1 may open. Any "[o]perable sections of windows" "shall not permit openings that allow passage of a 4-inch-diameter . . . sphere." (§ 1013.8.)

There are exceptions to the fixed four-inch spherical clearance rule, such as for emergency exits. One of the exceptions is for "windows that are provided with fall prevention devices that comply with ASTM F2090." (§ 1013.8, Exception 3; see § 1013.8.1.) Under section 1013.8.1, a "window opening control device, after operation to release the control device allowing the window to fully open, shall not reduce the minimum net clear opening area of the window unit to less than" (§ 1013.8.1) "5.7 square feet (0.53 m²)." (§ 1029.2 [cross-referenced in § 1013.8.1].)[9]

Stated somewhat more simply, sections 1013.1, 1013.8 and 1013.8.1, when read together, provide that certain windows in residential buildings— operable windows that open at the sill more than six feet above ground level, where "the lowest part of the clear opening of the window" is more than three feet from the floor[10]—may, in some circumstances, open wide enough for a

_____

[9] We understand the term "fall prevention device" to be interchangeable with the term "window opening control device." Section 1013.8.1 specifies that complying devices must meet ASTM F2090, a technical standard that neither party contends is pertinent here. Beyond this technical specification, section 1013.8.1 does not specify any single style of device or describe how it must be attached to an operable window. At oral argument, plaintiffs' counsel stated his understanding that a complying device may attach to one or both of the window frame and the window sill; and, mechanically, may accomplish its restrictive function in a variety of ways. There was no dispute on this point.

[10] Oddly, the trial court appears to have construed this language to mean that to the floor-to-sill height requirement must be measured from the

human body to fall through, but as pertinent here, that is the case only if they are equipped with a fall prevention device.

### 3. Section 3404.1.1: Text, Context, and Framework of the Building Code As a Whole

It is undisputed that the minimum height requirements specified in section 1013.8 required the defendants to install a fall prevention device in plaintiffs' bedroom window during the renovation of the Blakely Townhomes, unless some exemption applied. The question we must resolve is whether defendants may claim the exemption in section 3404.1.1 for the replacement of "original building materials" in the "[a]lteration" of a building that "complied with the [Building Code] at the time of the original construction" and did not become a "substandard building" after the "alteration" took place. (§ 3404.1.1.) The trial court ruled that this exemption applies. For four reasons, we cannot agree.

*First*, looking initially to the text of section 3404.1.1, the starting place for our analysis, we reject defendants' contention that as a matter of plain English a window may be considered a "material[]." A window's glazing or the wood or metal used in its framing, perhaps yes, but not the window installation as a whole. According to plaintiffs, the word "material[]" means a substance such as stone, brick or timber from which buildings are made. Applying the precept that the word "material[]" in the Building Code must be given its "usual and ordinary meaning" (*Witt Home Ranch, Inc. v. County of Sonoma* (2008) 165 Cal.App.4th 543, 559), plaintiffs' proffered interpretation fits with our own general understanding of the term in everyday usage.

___

floor to the *top* of the window, which apparently led it to question whether section 1013.8 applies at all, though ultimately it based its nonsuit ruling on the section 3404.1.1 exemption. The defendants do not advance or defend that reading of section 1013.8 here on appeal.

22

Plaintiffs cite two dictionary definitions of "material" to support their position. According to them, a "material" as understood in common speech is " 'a physical substance that things can be made from' " including " 'building materials, such as stone' "[11] or "a solid substance . . . such as a metal."[12] Setting up a battle of dictionary definitions, defendants point to a sense in which the word "materials" is defined in one of the same dictionaries plaintiffs rely upon as " 'things you need for a particular activity,' " for example where "builders ran out of materials."[13] And they attempt to undercut the definitions offered by plaintiffs, citing *Busker v. Wabtec Corp.* (2021) 11 Cal.5th 1147, 1159 (*Busker*) for the principle that courts treat dictionary definitions as "context" that provide only a "general definition."

Naturally, we take as settled everything our Supreme Court said in *Busker*, but we note defendants overlook language in that case stating that a "court should not rely on a dictionary definition of a term *specifically defined in the statute*." (*Busker*, *supra*, 11 Cal.5th at p. 1159, original italics.) Here, neither the term "original materials" nor either of its variants, "building materials" or "materials," is defined in the Building Code. Bearing in mind that "[s]ometimes the 'ordinary dictionary' meaning of a word coincides with its statutory definition[,]" but "[t]hen again, sometimes it does not" (*Scott v.*

---

[11] Cambridge Dictionary Online as captured by Internet Archive on July 5, 2024 <https://web.archive.org/web/20240705195536/https://dictionary.cambridge.org/us/dictionary/english/material> (as of Nov. 7, 2025).

[12] Collins Dictionary Online (2025) <https://collinsdictionary.com/us/dictionary/english/material> (as of Nov. 7, 2025).

[13] Collins Dictionary Online (2025) <https://collinsdictionary.com/us/dictionary/english/material> (as of Nov. 7, 2025).

*Continental Ins. Co.* (1996) 44 Cal.App.4th 24, 30), the respective dictionary definitions offered by each side do not provide a strong enough clue to resolve the issue before us by looking to literal meaning alone. They only inform the first step in the textual analysis, but as a first step, they tend to favor plaintiffs. They also confirm we are dealing with an ambiguity, so we must consult other interpretative tools.

*Second*, we think a window should not be understood to mean a "original material[]" for purposes of the section 3404.1.1 exemption when all of the words in the provision are read as a whole. Section 3404.1.1 reads, "[T]he replacement, retention and extension of original materials, and the use of original methods of construction [shall be permitted]." (§ 3404.1.1.) Nine types of "materials" are called out in the Building Code index and each "material[]" is covered in its own chapter of the Code. (See Cal. Code Regs., tit. 24, ch. 19 [concrete], ch. 20 [aluminum], ch. 21 [masonry], ch. 22 [steel], ch. 23 [wood], ch. 24 [glass and glazing], ch. 25 [gypsum], ch. 26 [plastic].)[14] Plaintiffs contend that, taken together, the phrases "original materials" and "original methods of construction" bolster their plain language argument because these distinct terms refer to all of the "material[s]" from which buildings are constructed, as specified in various chapters of the Code.

Defendants disagree, claiming that plaintiffs' reliance on words adjacent to the term "original materials" inappropriately folds multiple phrases together and is based on unfounded assumptions about the surrounding words in section 3404.1.1. But even granting that this may not be a textbook example of an interpretative problem controlled by the canon

[14] The Code contemplates in a catchall section that a tenth, unspecified category of "[a]lternative materials" may be used. (§ 104.11.) There are also two chapters devoted to "Structural Testing and Special Inspections " of all materials. (Cal. Code of Regs., tit. 24, chs. 17 & 17A.)

24

*ejusdem generis*—that words strung together in a series take their meaning from each other (*Medtronic USA, Inc. v. California Dept. of Tax & Fee Administration* (2025) 110 Cal.App.5th 817, 824)—plaintiffs still have the better of the contextual argument, given the detailed schema within the Code specifying the range of "building materials" used in the construction of a building.  When we consider all of the words in section 3404.1.1 together with the specific types of "materials" the Building Code contemplates may be used in building construction, we think the term is best construed consistent with the everyday meaning plaintiffs have proffered.

*Third*, widening our focus, and considering the overall framework of the Building Code, we see that a "building" consists of "elements" such as "walls," "floors," and "roofs,"[15] and that the "structure" of a "building" consists of "members" such as "columns" and "structural framing."[16]  The word "materials"—often used interchangeably with "building materials"—appears consistently throughout the Building Code to refer to the substances these constituent parts of buildings and structures are made "*of*" or constructed "*from*."[17]  The words "materials" and "building materials" are also used in

---

[15] E.g., section 202, Definitions (defining "Building Element" as "A fundamental component of building construction, listed in Table 601"); see Table 601 (listing, e.g., interior and exterior bearing walls and non-bearing walls, floor construction and associated secondary members, roof construction and associated secondary members).

[16] E.g., sections 602.4.1 to 602.4.3 and Table 602.4 (specifications for dimensions of wood columns, floor framing, and roof framing), and section 202 (defining "Structural Frame" as "The columns and the girders beams and trusses having direct connection to the columns and other members that are essential to the stability of the building.").

[17] E.g., section 602.3 ("Type III construction is that type of construction in which the exterior walls are of noncombustible materials and the interior building elements are of any material permitted by this code"), and section

various contexts in contradistinction to "systems,"[18] "assemblies,"[19] and "units."[20] For windows, the Code specifies in detail the types of glass panes that may be used and the support systems (the framing) that hold the glass in place.[21] Window "materials" are subject to structural testing as constructed into an "assembly" or "unit."[22] When considered in this wider context, windows are not "materials." A window is constructed *of* "materials" (e.g., glass or glazing) and includes the window frame (itself constructed of materials such as wood, aluminum, or as here, vinyl). In the taxonomy of the Building Code, a window is an "assembly" or a "unit" that is structurally part of the exterior wall of a building.[23] It is made of certain "materials" but is not itself a "material[]."

---

602.4.2 ("wood beams and girders shall be of sawn or glued laminated timber").

[18] E.g., section 3401.4 ("Building materials and systems shall comply with the requirements of this section").

[19] E.g., section 701.1 ("The provisions of this chapter shall govern the materials, systems and assemblies used for structural resistance and fire-resistance rated construction separation of adjacent spaces . . . ."), and section 701A ("This chapter applies to building materials, systems and/or assemblies used in the exterior design and construction of new buildings located within a [fire hazard zone]").

[20] E.g., section 1710A.5, italics added (testing standards for "[e]xterior *window and door assemblies*"); *ibid.*, italics added (testing standards exception for "[s]tructural wind load design pressures for [certain small size] *window units*").

[21] E.g., section 2403.1 (specification for glass panes used in windows), and section 2403.3 (specifications for window frames).

[22] Section 1710A.5.

[23] See section 1405.4, italics added ("Flashing shall be installed at the perimeters of exterior door and *window assemblies* . . . where moisture could enter the wall.")

Arguing to the contrary, defendants claim that, by repeatedly tracking the language of Health and Safety Code section 17958.8 in what they characterize as a "like-for-like" safe-harbor provision,[24] the HCD adopted implementing language in section 3404.1.1 that exempted them from any requirement to install a fall prevention device on plaintiffs' bedroom window. Under this so-called "like-for-like" exemption, defendants claim that, subject to qualifications they say are indisputably met here—the Blakely Townhomes building was code-compliant when originally constructed and was not rendered substandard by the use of "like" materials in the renovation—an owner is permitted to make alterations to a building so long as it utilizes the same "materials" it used when the building was first constructed, without any need to comply with the Code's requirements for new construction.[25]

---

[24] The term "like-for-like" is not in the Code. As used by defendants, it appears to be a shorthand drawn from the language in section 3401.4.2, "[l]ike materials shall be permitted for repairs and alterations". (§ 3401.4.2.) This provision appears at the beginning of Chapter 34, which applies generally to "alteration[s], repair[s], addition[s] and change[s] of occupancy of existing structures." (§ 3401.1.) It is titled "Building materials and systems" (§ 3401.4) and has three subsections, one addressing "Existing materials" (§ 3401.1), one addressing "New and replacement materials" (§ 3401.4.2), and one addressing "Existing Seismic force-resisting systems (§ 3401.4.3). Defendants gloss over a difference in the scope of these three subsections. Two of them—including the subsection that includes the "like-for-like" exemption language they rely upon—apply just to "materials" (§§ 3401.4.2–3401.4.3), while the third applies more broadly to certain types of "systems" (§ 3401.4.3). This suggests that, where the HCD wished to extend what defendants are calling the "like-for-like" exemption" beyond "materials" to include something more (such as "systems," "assemblies," or "units"), it knew how to do so.

[25] In the course of this argument, defendants point to and rely on legislative history behind the HCD's adoption of section 3404.1.1. They cite two legislative committee reports that are part of the 2003 legislative history of Health and Safety Code section 17958.8 and, tracing the genesis of section

27

That may be right, but it begs the core question here:  Does a window qualify as a "material[]" within the meaning of section 3404.1.1?  This would be a different case if, for example, the wood frame of plaintiffs' bedroom window had rotted and suddenly failed when the they kicked the bottom of the frame while standing on the sill, causing the frame to dislodge from the wall and leave a gap large enough for them to fall through; there had been an upgraded 2013 Building Code requirement requiring that aluminum frames be used in new construction; and the claim here was that the defendants violated the Code by failing to use aluminum frames when they renovated Blakely Townhomes in 2016.  But that is not the case we have.  Defendants seek to extend the exemption for "original materials" to the entire window assembly as a package, rather than just the "materials" from which the various components of the window assembly were built.

Defendants propose that we read the phrase "original materials" more expansively than simply "materials," and on the facts presented here, they would not only have us hold that a replacement window is an "original material[]," but that it includes the glass in the window, the vinyl in the window frame (which presumably defendants would say they voluntarily chose to upgrade over the original aluminum) and all of its components (including the sill, the sash, the handle, and any flashing attached to the wall).  To support this protean notion of the term "original materials,"

_____

3404.1.1 to that statute, they point to the absence of anything in those committee reports that "suggests 'original materials' is limited to building materials such as stone or concrete."  Putting aside that this argument addresses Health and Safety Code section 17958.8 and tells us little or nothing about what the *HCD* intended in adopting section 3404.1.1 as an implementation of the statute, the *absence* of anything in these committee reports addressing the meaning of "building materials" favors neither side here.

28

defendants find support in section 302.4 of the 2022 Existing Building Code,[26] a provision restating the "like-for-like" exemption in terms nearly identical to section 3404.1.1 but with an express exception for the replacement of certain residential garage doors.  After arguing somewhat cryptically in the responding brief that "later provisions of relevant codes are relevant," defendants elaborated on their interpretive theory at oral argument.  There, they contended that section 302.4 of the 2022 Existing Building Code is relevant for two reasons:  It shows (1) the term "materials" is not limited to things like stone, wood, and glass, and (2) a garage door is basically no different than a window, so both doors and windows must be "materials."

This late-developed argument for taking an expansive view of the term "original materials" by analogy to section 302.4 of the 2022 Existing Building Code and applying the same reading to section 3404.1.1 is creative, but unpersuasive.  The exception in section 302.4 of the 2022 Existing Building Code is designed to make clear that, by statute, an emergency power supply must be connected to automatic residential garage door openers regardless of any "like-for-like" exemption for building alterations.  (See Health & Saf.

---

[26] Section 302.4 of the 2022 Existing Building Code is not in the Building Code exhibits that were submitted to us via stipulated request for judicial notice (see, *ante*, p. 2, fn. 1), but we located it on our own at California Code of Regulations, title 24, part 10, and by sua sponte motion take judicial notice of its existence.  According to the defendants' responding brief, the Existing Building Code is a "separate code included . . . at the end of the . . . Building Code" and in 2013 "was limited to addressing seismic strengthening of existing buildings."  It has apparently been expanded considerably since then and now broadly covers the "repair, alteration, change of occupancy, addition to and relocation of existing buildings."  (Cal. Code of Regs., tit. 24, pt. 10, § 101.2.)  Unlike the sections of the 2022 Existing Building Code that the defendants presented to us on the eve of oral argument, section 302.4 of the 2022 Existing Building Code was cited and discussed in the responding brief.

Code § 19892.)  Given the specific statutory mandate for a particular kind of safety device for a particular kind of garage door, we are doubtful that the automatic garage door exception in section 302.4 of the 2022 Existing Building Code teaches anything that may be generalized to other provisions in the Building Code, especially provisions predating the 2022 revision by more than a decade (section 3404.1.1, as noted above, was adopted in 2010).

Even if defendants were right that section 302.4 of the 2022 Existing Building Code could shed some light on the meaning of the term "original materials" in section 3404.1.1, we fail to see how changes made to the Code *after* the renovation of Blakely Townhomes are pertinent here.  The defendants cite *Busker*, *supra*, 11 Cal.5th at p. 1159, for the idea that the amendment of a statute can clarify the meaning of originally enacted statutory language.  As a general principle, that is an unexceptional description of how courts sometimes examine legislative history over a long arc to divine current meaning, as the *Busker* court did.[27]  But because the

---

[27] At issue in *Busker* were certain penalties assessed by the Labor Commissioner against a public contractor in 2015 for failing to pay two years of wages for certain workers who installed a control system for railway cars on the Metrolink system in Los Angeles.  (*Busker*, *supra*, 11 Cal.5th at pp. 1153–1154.)  The central question in the case, a question of statutory interpretation, turned on the meaning of the term "public works" in Labor Code section 1720, subdivision (a)(1), a minimum wage statute which was originally enacted by the Legislature in 1931.  *(Busker*, at p. 1155.)  In the course of a lengthy and detailed statutory interpretation analysis that focused heavily on legislative history (*id*. at pp. 1156–1168), the court took into account amendments to the statute in 2000 and 2012 (*id*. at pp. 1162–1163), and considered whether those amendments changed or clarified the meaning of the term "public works" as originally enacted (*id*. at p. 1164 [the court's conclusion was that there was no change in meaning]).  What defendants overlook in relying on *Busker* is that all of the legislative history taken into account in that case—including the statutory amendments in 2000

30

negligence per se analysis in this case turns on the application of the Building Code at a specific point in time—2016—prior to the Code revision the defendants rely upon, they are inviting us to do more than rely upon legislative history in the conventional sense. They are in effect suggesting that a 2022 amendment should be given retroactive effect as a clarification of what the operative language of the 2013 Building Code always meant. That is an overreach. Even assuming a garage door (as contrasted with the substance from which it is made) can fairly be considered a "material[]," the argument generalizing defendants' reading of this highly specific garage door exception to other provisions in the Code—and doing so retrospectively—runs contrary to the rule that statutory or regulatory changes apply prospectively absent clearly expressed intent to the contrary.[28]

In addition to relying on a 2022 change to the Building Code, defendants point to an even more recent source of possible interpretive guidance, a 2024 administrative bulletin from the City of Oakland Building Bureau that they claim properly applies section 3404.1.1. The Oakland guidance bulletin gives the following example: "A window in a home . . . is being replaced. As a repair, it may be replaced 'in-kind'. In the case where the original window was non-tempered, it may be replaced with a non-

_____

and 2012—occurred *before* the application of Labor Code section 1720, subdivision (a)(1) to assess wage penalties in 2015.

[28] See *As You Sow v. Conbraco Industries* (2005) 135 Cal.App.4th 431, 459; *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1206; cf. also *Lewis v. Seventeenth Dist. Agricultural Assn.* (1985) 165 Cal.App.3d 823, 829, fn. 6 ("At oral argument, appellants requested this court take judicial notice of a change in CEQA guideline section 15323, concerning normal operations of facilities for public gatherings, where there is a past history of the facility being used for the same or similar kind of purpose. . . . We will not base relief to any party on the basis of any regulatory re-writing pending an appeal. The regulatory change is prospective only.")

31

tempered window although for fire safety it is highly recommended to use multipaned glazing with at least one pane of tempered glazing."  This illustration appears to address a repair, a type of change to an original building that defendants conceded below is not involved here and we have declined to address for the first time on appeal.  (See, *ante,* at pp. 19–20 and fn. 8.)  It also fails to mention section 3407 (which specifically addresses replacement of window glass) or whether the illustrative example given is pertinent to anything other than replacement of window glass.

Local administrative application of a statewide regulation, when drawn upon as an aid to determination of the disputed meaning of the regulation, "may be helpful, enlightening, even convincing.  It may sometimes be of little worth."  (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 8.)  For use as an interpretive aid in determining the meaning of the term "original materials" in section 3404.1.1, we place the 2024 Oakland guidance bulletin at the lower end of the *Yamaha* range of persuasive value.  Because the guidance bulletin raises more questions than it answers in the factual scenario presented here, it is even less helpful than section 302.4 of the 2022 Existing Building Code, which we find to be of little assistance.

### 4. Purpose and Public Policy

*Fourth*, and finally, we are persuaded that plaintiffs' reading of section 3404.1.1 best promotes the purposes of the Building Code and the public policy it seeks to further.  Section 1.8.1 states that a major purpose of the Building Code is "to establish the minimum requirements necessary to protect the health, safety and general welfare of the occupants [of every building throughout the State of California]."  (§ 1.8.1.)  This purpose mirrors the purpose stated even earlier in the statutory text, under chapter 1, "Scope and Administration."  (§ 1.1.2.)  The Health and Safety Code contains this

32

language as well, prohibiting "conditions to an extent that endangers the life, limb, *health*, property, *safety*, or *welfare* of the occupants of the building . . . ." (Health & Saf. Code, § 17920.3, italics added.)

Additionally, Moore, the expert safety engineer, testified about independent studies done in the 1990's that provide additional context to the purpose of the provisions requiring windowsills at a specified height to have opening control devices. These studies linked children falling from windows at that height and spurred the window safeguards being included in the building code requirements after 1980, recognizing the "major life safety issue" present under these circumstances. Here, Moore's testimony speaks to the purpose of the window-opening control device in the Building Code and aligns with the broader purpose of the Code in sections 1.1.2 and 1.8.1. His testimony also suggests that regular practitioners in the industry adhere to sections 1.1.2 and 1.8.1. Plaintiffs similarly highlight the industry-wide practice of adhering to the Code to promote public safety. We agree with them that interpreting the Building Code in the manner they propose most naturally "comports with its purpose." (*MacIsaac v. Waste Management Collection & Recycling, Inc.*, *supra*, 134 Cal.App.4th at p. 1083.)

Defendants do not offer a competing purpose to back up their interpretation of the Building Code. They instead claim that courts do not have the authority to " 'declare the public policy of the state.' " In support of this contention, they cite a California Supreme Court case in which the plaintiff brought a retaliatory termination action against the defendant on public safety grounds and in violation of public policy. (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 73.) We recognize the importance of this cautionary precept in *Green*, but defendants misunderstand its application. Of course an interpretation *untethered to enacted text* cannot be

33

adopted based on some judicial sense of the best "policy" of the law, but where the text is opaque, it is basic that the enacting purpose of a statute or regulation, and the animating public policy behind it, may provide guidance. After applying various other tools of interpretation, we draw upon this one last—for confirmation—and conclude that it too supports the reading of section 3404.1.1 proffered by plaintiffs.

## III. DISPOSITION

The judgment is affirmed with respect to the claim of general negligence and reversed with respect to the claim of negligence per se. The cause is remanded to the trial court for proceedings consistent with this opinion. The parties shall bear their own costs of appeal.

STREETER, J.

WE CONCUR:

BROWN, P. J.
GOLDMAN, J.

Trial Court:          Superior Court of California, County of Alameda

Trial Judge:          Hon. Frank Roesch

Counsel:             Trial Lawyers for Justice, Clinton E. Ehrlich-Quinn, Dan
                     Schaar and Eva Silva for Plaintiffs and Appellants.

                     Horvitz & Levy, Steven S. Fleischman, Scott P. Dixler,
                     Jasjaap S. Sidhu; Lewis Brisbois Bisgaard & Smith,
                     Joseph A. Salazar, Jr., and Ryan Matthews for Defendants
                     and Respondents.